UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEANETTE DARLENE YOUNG, | ) | Case No. 5:16CV2655 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | REPORT AND |
| | ) | RECOMMENDATION |

Plaintiff Jeanette Darlene Young ("Young" or "claimant") challenges the final decision of Defendant Commissioner of Social Security ("Commissioner"), denying her applications for a period of disability, disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

The issue before the court is whether the final decision of the Commissioner is supported by substantial evidence and, therefore, conclusive. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be remanded.

# I.  PROCEDURAL HISTORY

On June 17, 2013, Young protectively applied for a period of disability and DIB.  On February 10, 2015, she applied for SSI benefits.  Both applications alleged disability beginning April 17, 2013.  (R. 9, PageID #: 203-204, 214-217, 67.)  Young listed her physical or mental conditions that limit her ability to work as:  "epilepsy, migraines, depression, insomnia, memory loss, anxiety, back injury, arthritis, degenerat[iv]e disk disease."  (R. 9, PageID #: 234.)  Young's application was denied initially and upon reconsideration.  (R. 9, PageID #: 144, 129-143, 170, 145-169, 67.)  Thereafter, Young filed a written request for a hearing before an administrative law judge.  (R. 9, PageID #: 185-186.)

An Administrative Law Judge ("the ALJ") held the hearing on June 30, 2015.  (R. 9, PageID #: 93-128.)  Young appeared at the hearing, was represented by counsel, and testified.  *Id.* at 99-121.  A vocational expert ("VE") also attended the hearing and provided testimony.  *Id.* at 94, 121-127.

On August 27, 2015, the ALJ issued the decision, applying the standard five-step sequential analysis to determine whether Young was disabled.  (R. 9, PageID #: 67-84; *see generally* 20 C.F.R. §§ 404.1520(a), 416.920(a).)  The ALJ concluded Young was not disabled. (R. 9, PageID #: 67, 84.)

The Appeals Council denied Young's request for review, thus rendering the ALJ's decision the final decision of the Commissioner.  (R. 9, PageID #: 56-58.)  Young now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  The parties have completed briefing in this case.

Young presents the following legal issue for the court's review:  "Whether the ALJ's handling of treating neurologist Raymond Baddour, M.D.'s opinions violated the treating physician rule."  (R. 11, PageID #: 1046.)

## II.  PERSONAL BACKGROUND INFORMATION

Young was born on November 13, 1967, and was 45 years old on the alleged disability onset date.  (R. 9, PageID #: 99, 203, 83.)  Accordingly, Young was considered a younger individual age 45-49 for Social Security purposes.  *See* 20 C.F.R. §§ 404.1563, 416.963.  Young has a high school education, and is able to communicate in English.  (R. 9, PageID #: 116, 83.)  Young had past relevant work as a personnel clerk, assistant manager, personnel manager, and insurance clerk.  (R. 9, PageID #: 83.)

## III.  RELEVANT MEDICAL EVIDENCE[1]

Disputed issues will be discussed as they arise in Young's brief alleging error by the ALJ.  As noted earlier, Young applied for DIB and SSI benefits on June 17, 2013, and on February 10, 2015, alleging disability beginning April 17, 2013.  (R. 9, PageID #: 203-204, 214-217, 67.)  Young listed her physical or mental conditions that limit her ability to work as:  "epilepsy, migraines, depression, insomnia, memory loss, anxiety, back injury, arthritis, degenerat[iv]e disk disease."  (R. 9, PageID #: 234.)  Because Young's sole assignment of error concerns the

---

[1]  The summary of relevant medical evidence is not intended to be exhaustive.  It includes only those portions of the record cited by the parties and also deemed relevant by the court to the assignments of error raised.

opinions of neurologist Raymond Baddour, M.D., the court will primarily focus on his treatment of Young.

At a December 6, 2012, appointment with Jessica Witmer, R.N., FNP-BC,[2] Young reported that she had a seizure on November 11, but before that she had not experienced a seizure for "quite a few months," and had self-discontinued taking Depakote four months prior. (R. 9, PageID #: 497.)  Young stated that she stopped taking the medication because she was frustrated she was still having seizures while taking it.  *Id.*  Nurse-Practitioner Witmer reported that Young was initially diagnosed with seizure disorder with grand mal seizures in 2008.  *Id.* Young was not currently treating with a neurologist, so Witmer stressed to Young the "absolute need to follow [up] with neurology for monitoring of her seizure disorder and other neurological symptoms."  *Id.* at 497, 499.  Witmer also discussed the dangers of self-discontinuing the Depakote.  *Id.* at 499.

On referral from Witmer, Young appeared for a neurological consultation with Selwyn-Lloyd McPherson, MB,BS, M.D., on December 6, 2012.  (R. 9, PageID #: 426-433.)  Young reported having seizures three to six times a year, but indicated they were getting worse.  *Id.* at 426.  An extended EEG was conducted, which indicated normal results, with no evidence of focal or diffuse abnormalities, no evidence of epilertiform discharges, and no observed clinical seizures.  *Id.* at 463.

After the office examination, Dr. McPherson scheduled further neurodiagnostic exams, and a follow-up appointment.  *Id.* at 432-433.

_____

[2]  "FNP-BC" indicates Family Nurse Practitioner - Board Certified.

4

Young returned for neurological re-evaluations with Dr. McPherson on January 8 and 18, 2013.  (R. 9, PageID #: 464-469, 470-476.)  On January 18, Dr. McPherson adjusted her medications for insomnia and anxiety, and recommended that she discontinue Depakote, and treat for seizures with Topamax.  *Id.* at 476.

Later that same day, January 18, Young presented to NP Witmer for a well-woman visit, reporting that she felt well with minor complaints.  (R. 9, PageID #: 493-496.)  She told Witmer that there was some confusion about who was going to prescribe her Depakote, and Witmer restarted her with a short-term supply of the drug.  *Id.* at 495.  At a March 25, 2013, appointment with Witmer, Young reported that although she remained on her current dosage of Depakote, she had seizures on back-to-back days the previous week.  *Id.* at 478.  She advised that she had an appointment with neurology the next week.  *Id.* at 478, 480.

Young was seen by Dr. Baddour for a neurological evaluation on April 1, 2013, upon referral from NP Witmer.  (R. 9, PageID #: 585-587; *see also* PageID #: 617-619.)  Young reported a history of seizures since 2008, after which she was started on Depakote.  *Id.* at 585-586.  Dr. Baddour indicated it was unclear whether Depakote had an impact on her seizure frequency, noting that she has had seizures about every two months since 2011, most recently in March 2013.  *Id.*  Young reported having migraine headaches since she was thirteen years old, and experiences back pain following an injury in 2008.  *Id.*  Dr. Baddour's treatment plan was to continue Depakote, but to taper her off this medication in the future, and to begin Topamax for her seizures and headaches.  He also prescribed medications for her back pain.  *Id.* at 586.  An EEG and head MRI were planned for further evaluation.  *Id.*  She was instructed not to drive until medically cleared.  *Id.* at 587.

5

An EEG on April 15, 2013, showed no evidence of seizure activity or epileptiform abnormalities.  (R. 9, PageID #: 552.)  Imaging of Young's brain on April 26, 2013, was also unremarkable.  *Id.* at 553-554.

Young returned to Dr. Baddour for a follow-up appointment on May 17, 2013.  (R. 9, PageID #: 615-616; *see also* PageID #: 771-772.)  Dr. Baddour continued her on Depakote, with the plan to begin Topamax in the future.  *Id.* at 616.  She was instructed not to drive until medically cleared.  *Id.*  At a July 17, 2013 follow-up visit, Young reported that she had three seizures since May, most recently in June.  *Id.* at 613.  Dr. Baddour noted that recent EEGs and MRIs were mostly normal.  *Id.*  Dr. Baddour opined that her seizures may be triggered by emotional stress.  *Id.* at 614.  He also noted that Young had begun Keppra recently, and he continued her on  Depakote.  *Id.*  He also continued her on Vicodin, as needed, for her knee pain and back pain.  *Id.*  Dr. Baddour opined that "I do not feel that she is able to participate in employment at this time."  *Id.*

Young returned to Dr. Baddour for reassessment on September 24, 2013.  (R. 9, PageID #: 738-739.)  Young reported that recently she had been experiencing two to three seizures per week, and two syncopal episodes since May 2013.  *Id.* at 738.  Regarding her medications for seizures, Dr. Baddour noted that Topamax was not well tolerated, but Young had started Keppra earlier in the year, and was tolerating that medication well.  *Id.*  The doctor increased the Keppra dosage, and reduced the Depakote for one month to discontinue it.  *Id.* at 739.  He also changed the Vicodin to Norco.  *Id.*  Again, she was instructed not to drive.  *Id.*  The ALJ pointed out that, although claimant reported having two to three seizures per week, "there is no evidence of

emergency room treatment for seizures at that time or treatment by her primary care physician."
(R. 9, PageID #: 75.)

Young called Dr. Baddour on October 17, 2013, and again on November 6, to request
additional pain medication.  (R. 9, PageID #: 770, 768.)  The doctor increased her dosage of
Norco.  *Id.*  Young called Dr. Baddour on November 2, 2013, to report two petit mal seizures.
*Id.* at PageID #: 1007.

On December 30, 2013, Young had a follow-up visit with Dr. Baddour.  (R. 9, PageID #:
756-757.)  The doctor reported that Keppra had caused Young agitation, and he reduced her
dosage, which reduced agitation.  *Id.*  Dr. Baddour also had her begin Zonegran for her seizures.
*Id.* at 757.  On January 8, 2014, Dr. Baddour added an addendum to his consistently expressed
opinion that Young was unable to participate in employment at the time, to state:  "Due to the
patient's various conditions I feel that she is 100% disabled and unable to work at this time and
this status will be in effect for at least six months to one year."  *Id.*

At a May 7, 2014 follow-up appointment, Young reported to Dr. Baddour that she had
myoclonus (sudden, involuntary jerking of muscles) occurring about twice a week, and was
having complex partial seizures about once a week.  (R. 9, PageID #: 867-868.)  She reported
having three generalized seizures since January 2014, most recently in April.  *Id.* at 867.  Dr.
Baddour's impression was that Young has a generalized seizure disorder of focal onset, and
complex partial seizures, and that her seizures may be triggered by emotional stress.  *Id.*  She
also has myoclonus that may or may not be epileptic.  *Id.* at 867-868.  Young's dose of Keppra
had been reduced, the Zonegran was continued, and Dr. Baddour intended to begin her on

Tegretol for her seizures.  *Id.* at 868.  Dr. Baddour repeated his opinion that Young was "100% disabled" and unable to work.  *Id.*

Young returned to Dr. Baddour for a follow-up visit on September 12, 2014, and indicated that she had two generalized seizures since May 2014, the most recent occurring in July.  (R. 9, PageID #: 894.)  She was continued on Keppra and Zonegran, and prescribed an increase dosage of Tegretol.  *Id.* at 895.

At a January 14, 2015, appointment with Dr. Baddour, Young reported two pseudoseizures[3] since September 2014, but said her last generalized seizure was in July 2014.  (R. 9, PageID #:  930-931.  The myoclonus appeared to have resolved.  *Id.*  Dr. Baddour reduced her dosage of Tegretol, with a plan to discontinue it, due to concerns over impact on her liver functions.  *Id.* at 831.   She was continued on Keppra and Zonegran.  *Id.*  The ALJ pointed out that Young had remained free from generalized seizures for approximately six months, at that point.  (R. 9, PageID #: 78.)

At an April 24, 2015, appointment, Young reported to Dr. Baddour that she had four pseudoseizures since her January appointment.  (R. 9, PageID #: 951.)  Her last generalized seizure, however, occurred in July 2014.  *Id.* at 951-952.  The ALJ noted that Young continued to be free from generalized seizures.  (R. 9, PageID #: 78.)

---

[3]  "Pseudoseizures resemble epileptic seizures but have purely psychological causes; they lack the brain activity characteristic of epilepsy and the patient may be able to stop them by an act of will."  *Mann, ex rel. A.W. v. Astrue*, No. 1:10CV0255, 2011 WL 2784566, at *2 n.2 (N.D. Ohio July 15, 2011)* (citing *Dorland's Illustrated Medical Dictionary* 1537 (30th ed. 2003)); *see also Coleman v. Astrue*, No. 3:05-0389, 2010 WL 28567, at *12 (M.D. Tenn. Jan. 5, 2010).

Pertinent Medical Opinions

Young identifies two relevant medical opinions from Dr. Baddour concerning her seizure disorder.  (R. 11, PageID #: 1044-1046.)  On July 18, 2013, Dr. Baddour completed a medical source statement, in the form of a questionnaire, on Young's behalf, stating that he had treated her from April 1, 2013, to July 17, 2013.  (R. 9, PageID #: 608; *see also* PageID #: 75.)  Dr. Baddour reported that his diagnoses were:  Epilepsy, headache, depression, anxiety, posttraumatic stress disorder, back pain, lumbar compression fracture, knee pain, and restless leg syndrome.  *Id.*  To a question inquiring as to the "nature and symptoms of patient's medical condition," Dr. Baddour responded "see records."  *Id.*  To a question seeking a description of "all pertinent findings on clinical examination," Dr. Baddour responded "see records."  *Id.*  To a question inquiring as to "any surgical or clinical intervention required in treating this patient, Dr. Baddour responded "prescription medications [and] lumbar trigger point injections."  *Id.*

The questionnaire asked if Young was on any medications, and if so, requested a description of "the type of medication, its effectiveness and the patient's compliance."  (R. 9, PageID #: 609.)  Dr. Baddour responded "see records."  *Id.*  Dr. Baddour gave the same response to a question seeking a description of "the prescribed therapy and the patient's response to therapy."  *Id.*  Dr. Baddour responded that there were no issues of compliance that interfered with treatment.  *Id.*

Dr. Baddour indicated that Young's impairments imposed the following limitations on her ability to perform sustained work activity:  No repetitive bending; no carrying more than ten pounds; no climbing, driving, operating dangerous or heavy equipment; no standing more than

thirty minutes at a time; no prolonged sitting without breaks; and, unable to tolerate moderate or high stress work conditions." (R. 9, PageID #: 609.) Dr. Baddour concluded: "The patient is 100% and permanently disabled." *Id.*

On May 7, 2014, Dr. Baddour completed a "Seizures Residual Functional Capacity Questionnaire." (R. 9, PageID #: 863-865; *see also* PageID #: 77.) Dr. Baddour reported he had been treating Young since April 2013, and set forth the same diagnoses listed in the July 2013 questionnaire above. *Id.* at 863. Dr. Baddour indicated that Young had generalized, localized, grand mal and petit mal seizures. The doctor marked that she had grand mal seizures less often than once per month, and listed her three recent seizures as April, March and January of 2014. *Id.* Dr. Baddour also indicated that Young had petit mal seizures once weekly, but did not provide the requested dates of the three most recent such seizures. *Id.*

Dr. Baddour stated that Young always had warning of an impending seizure, and emotional stress was a precipitating factor in her seizures. (R. 9, PageID #: 863.) Dr. Baddour indicated that Young's seizures interfered with her daily activities to a marked degree, in that she "may be bedbound for a period of time after seizures." *Id.* at 864. The doctor reported that Young was compliant with taking her medications, that she took Keppra and Zonegran, but continued to have seizures, and that she had begun Tegretol in May 2014. *Id.*

Dr. Baddour marked that Young's seizures would likely disrupt the work of coworkers, and she would need more supervision at work than an unimpaired worker. (R. 9, PageID #: 864.) Young would need to take unscheduled breaks every hour during the workday, according to Dr. Baddour, and she would have to rest 15-30 minutes before returning to work. *Id.* Dr. Baddour further indicated that Young was incapable of even low-stress jobs. *Id.* The basis for

10

that determination was that stress triggers Young's seizures, and she has memory problems that may be due to anxiety, depression, PTSD, and her seizure medications. *Id.* at 864-865. The doctor estimated that Young's impairment would cause her to be absent from work more than three times per month. *Id.* at 865.

Dr. Baddour described Young's work limitations as being unable to tolerate fumes, loud noise, and temperature extremes. (R. 9, PageID #: 865.) The claimant would need to avoid dangerous equipment. *Id.* Dr. Baddour opined that Young is unable to sit for more than one hour, to stand or walk more than thirty minutes, to lift more than five pounds, and to bend or stoop. *Id.* Dr. Baddour again concluded that Young is "100% disabled and I anticipate this status will be permanent." *Id.*

Addressing this May 2014 RFC evaluation, the ALJ noted that Dr. Baddour did not indicate whether any of Young's seizures were witnessed. (R. 9, PageID #: 77.) The ALJ also indicated that, although noting that claimant was compliant with her medications and she continued to have seizures, Dr. Baddour failed to respond to whether her blood levels of anticonvulsant medication were recently less than therapeutic. (R. 9, PageID #: 77, citing PageID #: 864.)

State agency medical consultants, Gary Hinzman, M.D., and Edmond Gardner, M.D., assessed a range of light exertion, with frequent climbing of stairs, and frequent balancing, stooping, kneeling, crouching, and crawling. Young could never climb ladders, ropes, or scaffolds, and must avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation, and must avoid all exposure to hazards. (R. 9, PageID #: 137-138; 162-163, 81.)

11

IV.  ALJ's DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2018.

2.  The claimant has not engaged in substantial gainful activity since April 17, 2013, the alleged onset date (20 C.F.R. 404.1571 *et seq.* and 416.971 *et seq.*).

3.  The claimant has the following severe impairments:  lumbar degenerative disc disease, compression fracture L1, L2, lumbar radiculopathy, obesity (at times); epilepsy, complex partial seizures, pseudoseizures, asthma, right knee mild degenerative osteoarthritis, migraine headaches, restless leg syndrome/ periodic leg movement syndrome, major depression, generalized anxiety disorder, posttraumatic stress disorder, major depressive disorder, mild neurocognitive disorder, diabetes mellitus II, varicose veins and hyperglycemia (20 C.F.R. 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary  work as defined in  20 CFR 404.1567(a) and 416.967(a) except she should never climb ladders, ropes or scaffolds.  She can occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch and crawl.  She should avoid concentrated exposure to fumes, odors, dusts, gases and poorly ventilated areas and avoid all exposure to workplace hazards such as unprotected heights, hazardous machinery and any driving.  She is limited to simple, routine tasks that can be learned in 30 days or less with a reasoning level of 1-3 with only occasional changes, which are explained.  She is limited to low stress work which is defined as precluding tasks that involve high production quotas such as piece work or assembly line work, strict time requirements, arbitration, negotiation, confrontation directing the work of others or being responsible for the safety of others.  She can engage in superficial interaction with coworkers and the public but no over the shoulder supervision.

6.  The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.  The claimant was born on November 13, 1967, and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from April 17, 2013, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(R. 9, PageID #: 69-70, 72, 83-84.)

## V.  DISABILITY STANDARD

A claimant is entitled to receive DIB or SSI benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  20 C.F.R. §§ 404.1505(a), 416.905(a).

Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a disability determination.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Heston*

13

*v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001). The Sixth Circuit has

outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful
> activity during the period of disability. 20 C.F.R. § 404.1520(a)(4)(i). Second, the
> claimant must show that he suffers from a severe medically determinable physical
> or mental impairment. *Id.* § 404.1520(a)(4)(ii). Third, if the claimant shows that
> his impairment meets or medically equals one of the impairments listed in 20
> C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled. *Id.* § 404.1520(a)(4)(iii).
> Fourth, the ALJ determines whether, based on the claimant's residual functional
> capacity, the claimant can perform his past relevant work, in which case the
> claimant is not disabled. *Id.* § 404.1520(a)(4)(iv). Fifth, the ALJ determines
> whether, based on the claimant's residual functional capacity, as well as his age,
> education, and work experience, the claimant can make an adjustment to other
> work, in which case the claimant is not disabled. *Id.* § 404.1520(a)(4)(v).
>
> The claimant bears the burden of proof during the first four steps, but the burden
> shifts to the Commissioner at step five. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d
> 525, 529 (6th Cir. 1997).

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004); *see also* 20

C.F.R. § 416.920(a)(4).


## VI. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of

whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are

supported by substantial evidence. *Blakley v. Commissioner of Social Security*, 581 F.3d 399,

405 (6th Cir. 2009)*; Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence"

has been defined as more than a scintilla of evidence, but less than a preponderance of the

evidence. *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Kirk v. Sec'y of Health &*

*Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a

nature that a reasonable mind might accept it as adequate support for the Commissioner's final

14

benefits determination, then that determination must be affirmed.  *Wright*, 321 F.3d at  614; *Kirk*, 667 F.2d at 535.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion.  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).  This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *Wright*, 321 F.3d at  614; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  The court, however, may examine all the evidence in the record, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989); *Hubbard v. Commissioner*, No. 11-11140, 2012 WL 883612, at *5 (E.D. Mich Feb. 27, 2012) (quoting *Heston*, 245 F.3d at 535).

## VII.  ANALYSIS

Young presents the following legal issue for the court's review:  "Whether the ALJ's handling of treating neurologist Raymond Baddour, M.D.'s opinions violated the treating physician rule."  (R. 11, PageID #: 1046.)

It is well-recognized that an ALJ must generally give greater deference to the opinions of a claimant's treating physicians than to non-treating physicians.[4]  *Gayheart v. Commissioner*,

---

[4]  Revisions to regulations regarding the evaluation of medical evidence went into effect on March 27, 2017, and purport to apply to the evaluation of opinion evidence for claims filed before March 27, 2017.  82 *Fed. Reg.* 5844-5884 (Jan. 18, 2017).  Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took

15

710 F.3d 365, 375 (6th Cir. 2013); *Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544. This doctrine, often referred to as the "treating physician rule," is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treatment relationship with an individual are often best equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The treating physician doctrine requires opinions from treating physicians to be given controlling weight where the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)); *Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544. In other words, treating physicians' opinions are only given deference when supported by objective medical evidence. *Vance v. Commissioner*, No. 07-5793, 2008 WL 162942, at *3 (6th Cir. Jan. 15, 2008) (citing *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003)).

Social Security regulations require the ALJ to give good reasons for discounting evidence of disability submitted by the treating physician(s). *Blakley*, 581 F.3d at 406; *Vance*, 2008 WL 162942, at *3. Those good reasons must be supported by evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the weight assigned to the treating physician's opinion, and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Blakley*, 581 F.3d at 406-407; *Winning v. Commissioner*, 661 F.Supp.2d 807, 818-819 (N.D. Ohio 2009) (quoting SSR 96-2p). The obligation to provide good reasons permits meaningful and efficient

---

effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision.

review of the ALJ's application of the treating physician rule. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011).

The "good reasons" requirement is not simply a formality; it is to safeguard the claimant's procedural rights.  *Cole*, 661 F.3d at 937.  The Sixth Circuit has stressed the importance of this procedural requirement:

> Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," we have held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."

*Blakley*, 581 F.3d at 407 (quoting *Rogers v. Commissioner*, 486 F.3d 234, 243 (6th Cir. 2007)).

Further, even when a treating source's opinion is not entitled to controlling weight, an ALJ must still determine how much weight to assign to the opinion by applying specific factors set forth in the governing regulations.  *Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c).  The following factors are to be balanced in determining the weight to assign: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source."  *Cole*, 661 F.3d at 937 (quoting *Wilson*, 378 F.3d at 544).  Although the ALJ is directed to consider the factors, the ALJ is not required to provide an "exhaustive factor-by-factor analysis" in the decision.  *Francis v. Commissioner*, No. 09-6263, 2011 WL 915719, at *3 (6th Cir. March 16, 2011).

Young identifies two relevant medical opinions from Dr. Baddour concerning her seizure disorder.  (R. 11, PageID #: 1044-1046.)  Dr. Baddour completed a medical source statement, in the form of a questionnaire on July 18, 2013.  (R. 9, PageID #: 608-609.)  Dr. Baddour also

17

completed a "Seizures Residual Functional Capacity Questionnaire" on May 7, 2014.  (R. 9, PageID #: 863-865.)

In the July 2013 opinion, Dr. Baddour determined that Young's impairments imposed the following limitations:  "No repetitive bending; no carrying more than ten pounds; no climbing, driving, operating dangerous or heavy equipment; no standing more than thirty minutes at a time; no prolonged sitting without breaks; and, unable to tolerate moderate or high stress work conditions."  (R. 9, PageID #: 609.)  Dr. Baddour concluded:  "The patient is 100% and permanently disabled."  *Id.*

The May 2014 opinion was provided in the form of a seizures RFC questionnaire.  (R. 9, PageID #: 863-865; *see also* PageID #: 77.)  Dr. Baddour described the nature of Young's seizures, and indicated that they interfered with her daily activities to a marked degree, in that she "may be bedbound for a period of time after seizures."  *Id.* at 864.  The doctor reported that Young was compliant with taking her medications, but continued to have seizures.  *Id.*  Dr. Baddour indicated that Young would need to take unscheduled breaks every hour, and would have to rest 15-30 minutes before returning to work.  *Id.*  Dr. Baddour further indicated that Young was incapable of even low-stress jobs.  *Id.*  The doctor estimated that Young's impairment would cause her to be absent from work more than three times per month.  *Id.* at 865.

In addition, Dr. Baddour set forth a number of environmental work limitations.  (R. 9, PageID #: 865.)  The doctor opined that Young is unable to sit for more than one hour, to stand or walk more than thirty minutes, to lift more than five pounds, and to bend or stoop.  *Id.*  Dr. Baddour again concluded that Young is "100% disabled and I anticipate this status will be permanent."  *Id.*

18

The ALJ addressed the opinion evidence from Dr. Baddour as follows:

> As for the opinion evidence, I give some weight to Dr. Baddour's opinion regarding exertional and environmental limitations; however, I do not give weight to his opinion that the claimant is disabled. A finding that an individual is "disabled" or "unable to work," is an administrative finding and is an issue reserved to the Commissioner (20 CFR 404.1527(e)(1) and 416.927(e)(1)). While I have not disregarded his opinion, his opinion is not entitled to controlling weight or even given special significance (SSR 96-5p).

(R. 9, PageID #: 82.)

The Commissioner contends that "there is no treating physician opinion that merits controlling weight." (R. 13, PageID #:1071.) The Commissioner also states that Dr. Baddour had a "limited treatment relationship" with Young when his opinions were rendered, and thus suggests it is "highly questionable" whether Dr. Baddour's opinions merit consideration as opinions of a treating physician. *Id.* at 1072. The ALJ's decision, however, did not conclude that Dr. Baddour lacked the treating physician status.

A treating physician is defined as a physician who has provided medical treatment or evaluation, and who has an "ongoing treatment relationship" with the patient. *Daniels v. Commissioner*, No. 04-5709, 2005 WL 2739084, at *5 (6th Cir. Oct. 24, 2005) (citing 20 C.F.R. § 404.1502); *Bryant v. Astrue*, No. 2:09-00093, 2010 WL 2901842, at *2 (M.D. Tenn. July 19, 2010) (citing 20 C.F.R. § 416.902). "A physician who has treated a patient only a few times may be considered a treating source if that frequency of visits is appropriate for the claimant's medical condition." *White v. Commissioner*, No. 3:13CV2106, 2014 WL 4983665, at *5 (N.D. Ohio Oct. 6, 2014) (citing 20 C.F.R. § 404.1502).

As evidenced in the ALJ's decision, Dr. Baddour commenced a treatment relationship with the claimant on April 1, 2013. (R. 9, PageID #: 74; *see also* PageID #: 585-587.) The

ALJ's decision reflects a continuing treatment relationship throughout, with the most recent appointment dated April 24, 2015, four months before the ALJ's August 27, 2015, decision.  (R. 9, PageID #: 78, 84; *see also* PageID #: 951-952.)  There is no indication in the record that Dr. Baddour's treatment of Young did not accord with "a frequency consistent with accepted medical practice," (R. 13, PageID #: 1072), nor would the court characterize Dr. Baddour's treatment of the claimant as "sparse" (*id.*).  Rather, the record as recited more fully above demonstrates that Dr. Baddour provided medical treatment for Young's seizure disorder, which involved nearly ten appointments during the ongoing treatment relationship with Young over two years.  Dr. Baddour should be considered a treating physician in the circumstances of this case.

Young appropriately concedes that Dr. Baddour's opinion that she is disabled is an issue reserved to the Commissioner, and not entitled to any deference.  (R. 11, PageID #: 1049, citing *Schuler v. Commissioner*, No. 03-3734, 2004 WL 2030280, at *4 (6th Cir. Sept. 8, 2004); *see generally* 20 C.F.R. §§ 416.927(d)(1), 404.1527(d)(1).)  However, Young contends that the ALJ's analysis of the doctor's opinion did not satisfy the requirements of the treating physician rule.  (R. 11, PageID #: 1049.)  The court agrees.

In addition to arguing that the doctor was not a treating physician, which this court rejects, the Commissioner further contends that the ALJ provided good reasons for the decision declining to give Dr. Baddour's opinion controlling weight, "and explained the weight accorded the opinion."  (R. 13, PageID #: 1072.)  Notably, the Commissioner provides no citation to the ALJ's decision in support of this contention.  *Id.*  In fact, other than dismissing (properly) the doctor's determination that Young is disabled and unable to work, the ALJ states in a cursory

manner, "[w]hile I have not disregarded his opinion, his opinion is not entitled to controlling weight or even given special significance (SSR 96-5p)."  This is inadequate.

The citation to Social Security Ruling 96-5p provides no further support for the ALJ's decision, because that Ruling simply clarifies Social Security Administration policy on how medical source opinions on issues reserved to the Commissioner, including whether an individual is disabled, are to be considered.  *Ferguson v. Commissioner*, 628 F.3d 269, 272 (6th Cir. 2010) (discussing SSR 96-5p, 1996 WL 374183 at *1 (July 2, 1996)).  There is no further discussion as to how the ALJ determined to give only "some weight" to the treating neurologist Dr. Baddour's opinions.

In contrast, and by way of example, the ALJ addressed other opinion evidence relevant to Young's claim as follows:

> I do not give weight to the State agency medical consultant's opinion for a range of light work.  Based on the claimant's obesity, right knee degenerative osteoarthritis (mild), degenerative disc disease of the lumbar spine and L1, L2 fractures, as well as varicose veins, I find a sedentary residual functional capacity is commensurate with the evidence.

(R. 9, PageID #: 82.)  State agency medical consultants, Dr. Hinzman and Dr. Gardner, had assessed a range of light exertion, with specific limitations.  (R. 9, PageID #: 137-138; 162-163.) Although concise, and governed by a different standard for addressing non-treating providers, the ALJ provided a reasonable explanation for rejecting the medical consultants' opinion.

The Commissioner argues that the court should not simply consider the sole paragraph which the ALJ devoted to discussing the weight assigned to Dr. Baddour's opinions, but rather should consider the ALJ's discussion of Dr. Baddour's treatment records throughout her

decision.  (R. 13, PageID #: 1074.)  The Commissioner contends that the decision as a whole supports the weight accorded to Dr. Baddour's opinion.  *Id.*

It is not the court's burden to provide evidence to support the ALJ's decision.  The regulations require the ALJ to give good reasons for discounting the treating physician's opinion.  *Blakley*, 581 F.3d at 406; *Vance*, 2008 WL 162942, at *3.  Those reasons must be supported by evidence in the record, and must be sufficiently specific to make clear the weight assigned to the treating physician's opinion, and the reasons for that weight.  *Gayheart*, 710 F.3d at 376; *Blakley*, 581 F.3d at 406-407.  Even though substantial evidence might otherwise support the ALJ's decision, the court must recommend remand because the ALJ failed to follow the procedural regulations.  *Wilson*, 378 F.3d at 544.  In assessing Dr. Baddour's opinions, the ALJ did not articulate good reasons for discounting the opinions submitted by the treating neurologist, nor did the ALJ provide any indication that she considered the factors set forth in the regulations to determine the weight assigned to the opinions.  *Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c); *Cole*, 661 F.3d at 937 (quoting *Wilson*, 378 F.3d at 544).

The case should be reversed and remanded.


Date:  <u>October 25, 2017</u>                    s/ David A. Ruiz
                                                 David A. Ruiz
                                                 United States Magistrate Judge


OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).